UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Scott Kennedy and FarmaSea
Health, LLC,

        Plaintiffs,

   v.

ITV Direct, Inc.; ITV Global, Inc.;
ITV Marketing Group, Inc. d/b/a
ITV Ventures; Direct Marketing
Concepts, Inc.; and Elite Virtual
Systems, LLC d/b/a EVS Group,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 08-6244 ADM/JSM

___

Justice Ericson Lindell, Esq., Stephen R. Baird, Esq., Brent A. Lorentz, Esq., and Karen A. Brennan, Esq.,Winthrop & Weinstine, PA, Minneapolis, MN, on behalf of Plaintiffs.

Rachna B. Sullivan, Esq., and Leah C. Janus, Esq., Fredrikson & Byron, PA, Minneapolis, MN; and Christopher F. Robertson, Esq., and Jason J. Jarvis, Esq., Seyfarth Shaw, LLP, Boston, MA, on behalf of Defendants.

___

## I.  INTRODUCTION

On February 26, 2009, the undersigned United States District Judge heard oral argument on the Motion to Compel Arbitration or, in the Alternative, to Transfer Venue [Docket No. 8] brought by Defendants ITV Direct, Inc. ("ITV Direct"); ITV Global, Inc. ("ITV Global"); ITV Marketing Group, Inc. d/b/a ITV Ventures ("ITV Ventures"); Direct Marketing Concepts, Inc. ("DMC"); and Elite Virtual Systems, LLC d/b/a EVS Group ("EVS Group") (collectively "Defendants").  Also before the Court are Defendants' Objections [Docket No. 30] to Magistrate Judge Janie S. Mayeron's January 8, 2009 Order [Docket No. 22] granting the Application for Leave to Take Immediate Discovery [Docket No. 3] by Plaintiffs Scott Kennedy ("Kennedy")

and FarmaSea Health, LLC ("FarmaSea") (collectively "Plaintiffs"). In their Complaint [Docket No. 1], Plaintiffs assert claims of trademark infringement and counterfeiting under the Lanham Act and common law, violations of the Minnesota Deceptive Trade Practices Act, unjust enrichment, and unfair competition. For the reasons set forth below, Defendants' Motion to Compel Arbitration is granted and Defendants' Objections, construed as an appeal, are denied as moot.

## II. BACKGROUND

FarmaSea is the exclusive owner of the SEA VEG®, SEA VEGG®, and FARMASEA® trademarks used in connection with dietary supplements. Compl. [Docket No. 1] ¶ 15. On November 17, 2004, Kennedy, the president of FarmaSea, entered into a Talent Agreement with ITV Direct. Kennedy Decl. ¶ 2 [Docket No. 40]; Compl. ¶ 18. Under the Talent Agreement, Kennedy agreed to serve as a performer for an infomercial to be produced, edited, and funded by ITV Direct for the sale of the SEA VEG® dietary supplement product ("Product"). Sciucco Decl. [Docket No. 27], Ex. A (Talent Agreement) ¶ 1(a)-(c). In exchange, ITV Direct was granted the exclusive right to promote, distribute, and sell the Product. Talent Agreement ¶ 2. The Talent Agreement expressly required that "[the] Product endorsed shall at no time . . . contain anything other than the exclusive and proprietary FARMASEA® Blend of Sea Plants, without written consent from Scott Kennedy." Id. The Talent Agreement included an arbitration clause. Id. ¶ 14(i).

The parties subsequently extended and clarified the rights and obligations under the Talent Agreement through an Addendum; a Working Agreement; and an Amendment to Talent, Addendum, and Working Agreement (hereinafter referred to collectively as "the Amendments").

Compl. ¶¶ 25-31.  Under the Amendments, ITV Direct had a right to continue selling the Product under the names and trademarks for the limited purpose of filling "all re-orders and continuity orders in perpetuity" after the termination of the Talent Agreement.  Sciucco Decl., Ex. B ¶ 3.  The Talent Agreement ultimately expired on March 18, 2008.  Compl. ¶ 32.

Following the expiration of the Talent Agreement, the parties attempted, but were unable, to negotiate an extension.  Id. ¶ 34.  By letter of May 7, 2008, Plaintiffs notified Defendants that ITV Direct's rights under the Talent Agreement and the Amendments were terminated, and Defendants were told to "immediately cease using the Names and Marks."  Id. ¶ 35.  However, Plaintiffs authorized ITV Direct to "honor any order placed for the Product up to the date of the termination letter, and authorized [ITV Direct's] distributors to sell any remaining inventory of the Product which the distributors had purchased from ITV."  Id. ¶ 36.  Plaintiffs concede that the terms of the Talent Agreement and the Amendments also gave ITV Direct the ongoing right to fill re-orders and continuity orders.  Id. ¶ 37.

On December 3, 2008, Plaintiffs filed this action, alleging that Defendants have "continued to use the Names and Marks without permission and other than in connection with filling re-order and continuity orders" and have "further used the Names and Marks to promote and sell infringing and counterfeit Products to an unknowing public."  Id.  Plaintiffs assert that the companies that had the right to manufacture the Product on behalf of Defendants while the Talent Agreement was in effect "have exhausted their supplies of Product Blend and no longer have the ability to manufacture the Product."  Id. ¶ 40.  Nevertheless, Plaintiffs maintain, Defendants continue to sell dietary supplements under the names and marks owned by Plaintiffs, and, thus, must be selling an infringing and counterfeit Product.  Id. ¶ 41.  Defendants move to

compel arbitration, arguing that the claims in this action are subject to the binding arbitration clause in the Talent Agreement.

## III. DISCUSSION

**A.     Arbitration**

The Federal Arbitration Act ("FAA" or "the Act"), 9 U.S.C. §§ 1-16, governs arbitration agreements relating to transactions involving interstate commerce. The Act provides:

> A written provision . . . or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The Act establishes a "federal policy favoring arbitration," requiring that courts "rigorously enforce agreements to arbitrate." Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987) (quotations omitted). "Generally, 'there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Telectronics Pacing Sys., Inc. v. Guidant Corp., 143 F.3d 428, 433 (8th Cir. 1998) (quoting AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986)). In considering a motion to compel arbitration, a district court is required to determine (1) whether a valid agreement to arbitrate exists between the parties and (2) whether the specific dispute is within the scope of that agreement. Pro Tech Indus., Inc. v. URS Corp., 377 F.3d 868, 871 (8th Cir. 2004). Plaintiffs do not argue that the arbitration clause is invalid, and, thus, the only issue for the Court is whether the dispute falls within the scope of

that arbitration clause.

The language of the arbitration clause is broad; it requires arbitration of "*[a]ny controversy or claim arising out of or relating to* this [Talent] Agreement that cannot be resolved through mediation or negotiation." Talent Agreement ¶ 14(i) (emphasis added). As one court has recognized: "[t]he phrase 'arising out of or relating to' has been interpreted broadly to encompass all claims, however labeled, which 'had their genesis in, arose out of, and related to' the contract." Spice Corp. v. Foresight Mktg. Partners, Inc., Civil No. 07-cv-4767, 2008 WL 2487259, at *5 (D. Minn. Apr. 29, 2008) (quoting CD Partners, LLC v. Grizzle, 424 F.3d 795, 801 (8th Cir. 2005)); see also Medtronic, Inc. v. ETEX Corp., No. Civ. 04-1355, 2004 WL 950284, at *2 (D. Minn. Apr. 28, 2004) (describing an arbitration clause containing similar language as being "the paradigm of a broad clause") (quotation omitted). When presented with such a broadly worded arbitration clause, a district court must send a claim to arbitration as long as "the underlying factual allegations simply touch matters covered by the arbitration provision." See 3M Co. v. Amtex Sec., Inc., 542 F.3d 1193, 1199 (8th Cir. 2008) (quotation omitted). In addition, such broadly worded arbitration clauses are generally construed to encompass tort claims arising from the contractual relationship. Hudson v. ConAgra Poultry Co., 484 F.3d 496, 499-500 (8th Cir. 2007); see also CD Partners, 424 F.3d at 800 ("Broadly worded arbitration clauses . . . are generally construed to cover tort suits arising from the same set of operative facts covered by a contract between the parties to an agreement.").

Defendants argue that Plaintiffs' claims fall within the arbitration clause of the Talent Agreement. They contend that the Complaint is "replete with references to and incorporation of the [Talent] Agreement" and essentially alleges that Defendants's continued marketing, sale, and

5

distribution of the Product exceeds the scope of the limited right granted in the Talent Agreement to fill re-orders and continuity orders after the expiration of the Talent Agreement. Defs.' Mem. in Supp. of Mot. to Stay and Compel Arbitration or to Transfer [Docket No. 25] at 7-9. Plaintiffs respond that their claims arise solely out of Defendants' "counterfeiting of the Product using Plaintiffs' Names and Marks" and that, under the facts alleged, "the claims can be maintained irrespective of the rights and obligations created by the [Talent Agreement]." Pls.' Mem. in Opp'n to Mot. to Compel Arbitration or Transfer [Docket No. 36] at 11-12. They contend the Talent Agreement does not address the issue of the sale and distribution of counterfeit Product. The Court disagrees.

Plaintiffs argue that under the Talent Agreement, "Defendants did not obtain, and cannot argue that they obtained, a contractual right to counterfeit the Product." Id. at 14. Plaintiffs' argument misses the point; the question is not whether the Talent Agreement gives Defendants a right to counterfeit the Product. Rather, the relevant consideration is whether the Talent Agreement contemplated the issue of counterfeiting at all. Here it does—it expressly prohibits the sale or distribution of counterfeit product. Although Plaintiffs are correct in their assertion that the Talent Agreement does not touch on the *manufacture* of counterfeit product, the terms of the Talent Agreement unequivocally touch on the *sale or distribution* of counterfeit Product. A provision in the Talent Agreement requires that "[the] Product endorsed [by ITV Direct] shall at no time . . . contain anything other than the exclusive and proprietary FARMASEA® Blend of Sea Plants." Talent Agreement ¶ 2. Another provision in one of the Amendments also raises the issue of counterfeit Product, giving ITV Direct a right to sell certain "knock-off" versions of the Product subject to profit sharing with Plaintiffs. Sciucco Decl., Ex. C (Working Agreement) ¶

13. Accordingly, if Plaintiffs prove their allegation that Defendants are marketing, distributing, and selling the Product under Plaintiffs Names and Marks that is not Plaintiffs' authentic Product (the exclusive and proprietary FARMASEA® Blend of Sea Plants) then Defendants would seemingly be in breach of both the Talent Agreement and the Working Agreement.[1]

To support their position that their counterfeiting claims are not covered by the arbitration clause, Plaintiffs rely heavily on Sybaritic, Inc. v. NeoQi, Ltd., No Civ. 03-6073, 2004 WL 2066853 (D. Minn. Aug. 31, 2004). The plaintiff in Sybaritic had entered into an agreement with a company named Balteco for the manufacture of the plaintiff's product invention. 2004 WL 2066853, at *1. Sometime later, the chairman of the board for Balteco, Mati Vann, left the company, started a new company, NeoQi, and allegedly used the plaintiff's proprietary information to begin manufacturing a competing and infringing product. Id. at *2. In an effort to avoid losses, the plaintiff entered into a distributor agreement (containing an arbitration clause) with NeoQi that gave the plaintiff the exclusive right to sell and distribute NeoQi's product. Id. At some point, NeoQi decided to "void" the distributor agreement, and, in response, the plaintiff filed suit alleging claims for breach of the distributor agreement against NeoQi, as well as claims for unfair competition and misappropriation of trade secrets against Vann. Id. In declining to submit the unfair competition and misappropriation of trade secrets claims to arbitration, the court reasoned that the distributor agreement containing the arbitration clause concerned the sale, delivery, shipment, or demonstration of the product, not the designing or manufacturing of the product. Id. at *4. Therefore, because the unfair competition and

---

[1] To the extent that Plaintiffs may have a non-arbitrable cause of action against Defendants' suppliers who allegedly manufactured the counterfeit product, those suppliers are not parties to this action.

misappropriation claims related to the designing and manufacturing of the product, they were not covered by the arbitration clause. Id.

Sybaritic is inapposite. Unlike the claims at issue in Sybaritic, Plaintiffs' claims are not based on an allegation that Defendants themselves are designing or manufacturing a counterfeit product, but rather on Defendants' alleged "*distribution* of a counterfeit product" and "*sales* to all customers . . . [of] a counterfeit product." Pls.' Mem. in Opp'n of Mot. to Compel Arbitration or Transfer at 9, 15 (emphasis added). Denali Flavors, Inc. v. Marigold Foods, L.L.C., 214 F. Supp. 2d 784 (W.D. Mich. 2002), also cited by Plaintiffs, is similarly inapposite. The counterfeiting and infringement claims in Denali, which were found to be outside the scope of the arbitration agreement, were also based on an allegation that the defendant was manufacturing a counterfeit product. Id. at 785, 787.

In addition, Plaintiffs emphasize that their counterfeiting claims under the Lanham Act and state law would exist regardless of the rights and obligations established in the Talent Agreement and, therefore, those claims can be maintained irrespective of the Talent Agreement. Plaintiffs' ability to predicate their counterfeiting-based claims on statutory and common law rights rather than the terms of the Talent Agreement does not, however, diminish the Court's "duty to enforce arbitration agreements." McMahon, 482 U.S. at 226. As previously discussed, the Talent Agreement expressly contemplates the issue of the sale and distribution of knock-offs or counterfeits of Plaintiffs' Product, and, thus, the allegations that Defendants are selling and distributing counterfeit Product "arise out of the contractual business relations between the parties and are therefore arbitrable." Medtronic, 2004 WL 950284, at *3 (citing Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 723-24 (9th Cir. 1999)).

Lastly, Plaintiffs argue that because the Talent Agreement has been terminated, its arbitration clause has expired. The Talent Agreement explicitly provides for a continuing right to fulfill re-orders and continuity order, even after expiration of the Talent Agreement. Nevertheless, Plaintiffs maintain that their "counterfeiting-based claims do not touch upon this continuing right in any way." Pls.' Mem. in Opp'n to Mot. to Compel Arbitration or Transfer at 17. Therefore, Plaintiffs contend, the arbitration provision in the expired Talent Agreement does not apply, or survive, with respect to Plaintiffs' claims. See Koch v. Compucredit Corp., 543 F.3d 460, 466 (8th Cir. 2008) (holding that when a dispute arises after the expiration of an agreement containing an arbitration clause, the dispute will be subject to arbitration only if it "'involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement'") (quoting Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. Nat'l Labor Relations Bd., 501 U.S. 190 (1977)). As previously explained, the counterfeiting claims do touch on rights and obligations established under the Talent Agreement, and, therefore, Plaintiffs' argument that the arbitration clause did not survive termination of the Talent Agreement is rejected.

Because Plaintiffs' claims come within the scope of the arbitration clause, Defendants' motion to compel arbitration must be granted. As a result, the Court need not consider the alternative request by Defendants for transfer to the District of Massachusetts.

**B.      Objection to Magistrate Judge's Order**

Defendants appeal Judge Mayeron's January 8, 2009 Order granting Plaintiffs' Application for Leave to Take Immediate Discovery. After Defendants stated their intent to appeal the January 8, 2009 Order, Judge Mayeron stayed her order pending that appeal. Jan. 8, 2009 Order at 1 n.1. The Court need not address the appeal of Judge Mayeron's Order because Defendants' motion to compel arbitration must be granted, and thus, the litigation (including the discovery granted in the January 8, 2009 Order) is stayed. Defendants' appeal of the January 8, 2009 Order is therefore moot.

### IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Compel Arbitration or, in the Alternative, to Transfer Venue [Docket No. 8] is **GRANTED**;

2. The litigation is **STAYED** pending arbitration; and

3. Defendants' Objections [Docket No. 30] to Judge Mayeron's January 8, 2009 Order, construed as an appeal, are **DENIED AS MOOT**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: May 4, 2009.